476 P.2d 673

**STATE of Arizona, Appellee,**

v.

**David Joseph ANDREWS and Jean Ellen Hughes, Appellants.**

**No. 2009.**

Supreme Court of Arizona, In Banc.

Nov. 13, 1970.

Gary K. Nelson, Atty. Gen., by Carl Waag, Asst. Atty. Gen., Phoenix, for appellee.

Ross P. Lee, Public Defender, by James H. Kemper, Deputy Public Defender, Phoenix, for appellants.

McFARLAND, Justice.

David Joseph Andrews, hereinafter referred to as defendant Andrews, and Jean Ellen Hughes, hereinafter referred to as defendant Hughes, were each convicted of two counts of assault with a deadly weapon and were sentenced to serve not less than 25 or more than 30 years on each count to run concurrently. From the conviction and sentence of the court they appeal.

Count I charged that the defendants committed assault with a deadly weapon against one V. E. Jones in violation of A.R.S. § 13–249, and Count II charged the defendants with assault with a deadly weapon against one Fred Grantham.

On April 4, 1968, officer Fred Grantham of Tempe, Arizona, working "the graveyard shift", at approximately 5:00 A.M. observed defendants standing by a brown Chevrolet parked at the rear of Ryan-Evans Drug Store at 10th and Mill in Tempe. Another patrol car was proceeding north down the street. They appeared to become very interested in that particular patrol unit and became still until the car passed. After the patrol car passed their vehicle was started, the lights came on and they proceeded north on Mill Avenue. Officer Grantham pulled behind them and stopped their vehicle about one-half block north for a routine check. There were four people in the car, the defendants, and Charlie and Harold Tobias who were minors riding with the defendants on their way to California. Defendant Hughes had been driving the car and officer Grantham requested her driver's license and a vehicle registration. She looked through her purse, the glove compartment and the trunk but was unable to produce either. In the meantime officer Carpenter came into the area. Defendant Hughes had told Grantham that her name was Jean Powers. The officer checked it with the Motor Vehicle Division through the dispatcher and was informed that the license plates were for a different car. Upon the failure to produce a driver's license or registration, the officers requested they follow them to the police station with the intention of having the driver "post bond for driver's license, registration and fictitious license plates." Defendant Hughes was instructed to follow Grantham's unit and Sergeant Carpenter was to follow the defendants' car. It was necessary they make a "U" turn on the divided highway. Officer Grantham made the "U" turn. Defendant Hughes, instead of following, turned into the northbound lane of the one-way road heading in the wrong direction. It was at this time that the chase started.

Grantham observed two subjects leaning out of the right-hand side of the vehicle and was warned by his fellow officer by radio that they were shooting. He noted indications on the pavement from bullets and heard the reports of the weapons. The defendants' car was a lane's width from Grantham's car and was at close range to it. He testified they were firing at him; that he was able to see who was firing and testified it was defendant Andrews and another subject, namely Harold Tobias; that they were both firing at the same time; that there was a total of 20 or 25 shots fired and two or three at that particular point. They were proceeding down Mill Avenue with defendants' car against the traffic. Officer Grantham was in the southbound lane with a red light and siren on. When they arrived at 10th and Mill, Officer V. E. Jones confronted the defendants' vehicle and when their vehicle approached Officer Jones, Officer Grantham noticed him ducking into the seat of his car. When they proceeded on around the curve onto Apache Boulevard they met a car and a couple of motor vehicles. The defendants' car went between the two motor vehicles. They were then near the intersection of McAllister and Apache Boulevard. The vehicle then made a very sharp, speedy turn to head north on McAllister. Officer Grantham proceeded to follow north and followed the defendants' car when they turned right at Orange where they abandoned their car. The defendants were followed and apprehended. The officers found two .22 caliber weapons in the front seat of the car. One was a larger gun than the other, one holding nine shells and the other seven. On the rear seat was a small caliber seven-shot hand gun, similar to the one on the front seat. The guns were identified and introduced into evidence. They also found a rifle in the trunk of the car. Sergeant Carpenter also described the manner in which the defendants' car was turned in the highway.

He observed the defendant Andrews, and one of the juveniles shooting at his car. His description of the maneuvering of the cars and the shooting was substantially the same as that of Officer Grantham.

Officer V. E. Jones testified he was on duty on the morning of April 4, 1968 and heard the radio transmission of the chase. As he approached 10th Street he observed the car in the soutbound lane bearing down on him. He stopped the patrol unit and started the rotary red light on the top of the car. At this point the car was approximately 40 to 50 feet away from him. He testified "I observed the driver of the vehicle, Miss Hughes, stick her arm out the window with a gun in hand, take a rest on the outside rearview mirror, and at that point I thought that she would shoot at me, and I leaned over in the seat. Immediately I heard three reports and the—upon hearing the third report I heard something hit the car." He also identified a picture of his patrol car and pointed out a bullet mark on it. He further testified as to the maneuvering and the driving of the cars, stating that the approximate speed was 60 or 65 m. p. h.

Three witnesses were called by counsel for the defendants—the defendants Hughes and Andrews and Don Green, an officer at the jail where the defendants were incarcerated. Defendant Hughes testified that she had left Tucson for California; that she and Andrews were both "loaded" with drugs; that she had taken peyote and LSD, and Harold Tobias had taken some peyote, but she testified "I don't think Charlie was loaded. Drugged up, I mean. But could have been, I don't know." She said that she was hallucinating; that she did not pull out a gun and shoot and based her argument largely upon the speed of her car, stating that she was never driving under 90 m. p. h. and did not take her hands off the wheel and that she had her foot all the way to the floor boards. In regard to the shooting she said:

"I imagine, you know, this is just assumption, I imagine some of the people might have been, but I know I didn't. There was one point, I guess there was shooting, I didn't hear it, that Dave was beating on Larry's arm trying to get the gun away from him. So I guess he was shooting, but I didn't hear the shots. I wasn't paying that much attention to it. The only thing I remember out of it, you know, from hearing about it, was that he was trying to get the gun away from Larry. That is all—Harold Tobias, we call him Larry."

She did not in any way directly implicate the defendant Andrews in the shooting. Her testimony in regard to remembering what happened was—"There is quite a bit of it I don't. I don't remember because of the hallucinations and there is quite a bit I don't remember."

In answer to a question about the testimony of Officer Jones in regard to her shooting she stated: "It didn't happen from me. I am positive. I couldn't have shot. Cause I was driving and I had to have both hands on the wheel. Besides that he said, I believe, something about a bare arm or something, and I had a long sleeved blouse on." Her counsel in his brief sums up her testimony as follows:

"Hughes told the jury that she was twenty-two years old and that on the day in question she and the other three men in the car had driven to Tempe from Tucson. She recalled being pulled over by a police car. She admitted having no driver's license or a registration certificate. Then she said that she had been told to follow Grantham to the police station. She remembered going down the wrong side of the road but her testimony soon degenerated into an almost incoherent account of the day in question. She seemed to remember very little between driving down the wrong side of the road and being captured in someone's garden. She vaguely remembered a squad car coming at her. She denied shooting at anybody. Hughes explained that her memory of the foregoing events was sketchy because half the time that

she was driving in this chase, she was hallucinating. The night before she had taken some peyote. She had also taken some LSD. She told the jury that she had been on drugs since she was nine years old. She denied again and again firing a gun."

The defendant Andrews testified that he and defendant Hughes had lived on a ranch in Tombstone for about two years. He corroborated the testimony of defendant Hughes about taking the drugs and being "loaded" and that he did not remember making a trip from Tucson to Phoenix. He did not recall being arrested and only vaguely remembered being in jail in Phoenix.

On cross-examination he testified in regard to the things he was charged with "I can't deny them. I can't say that I didn't do them." Counsel in his brief sums up his testimony as follows:

"When David Joseph Andrews took the stand he testified that he was twenty-one years old and he generally denied remembering any of the events in question. Apparently, the last thing he remembered was arriving in Tucson. He did not remember coming from Tucson to Phoenix. His explanation for his inability to remember was that, like Hughes, he had been taking drugs, in his case since 1964. He had been taking peyote. He had been taking LSD for seven steady months. He had taken methedrine and benzedrine. He may even have taken Darvon. The next thing that Andrews remembered, after Tucson, was being in the Tempe jail."

Officer Don Green testified that he was a police officer employed by the City of Tempe in April of 1968 in the capacity of jailer; that he observed defendants Hughes and Andrews and that Andrews seemed to be having "withdrawals". Also that defendant Hughes did not seem to be well at the time.

Counsel contends that the evidence was not sufficient to carry the case to the jury. The answer depends on whether there was substantial evidence to support the verdicts. We have held in reviewing the sufficiency of evidence to support a verdict that it must be reviewed in a light most favorable to the state and all reasonable inferences must be resolved against the defendant, State v. Crawford, 106 Ariz. 322, 475 P.2d 936; State v. Reyes, 99 Ariz. 257, 408 P.2d 400, 14 A.L.R.3d 1262, and that it is only in the absence of probative facts to support the verdict that reversal is justified. State v. Crawford, supra.

In the instant case the testimony was that the two defendants were riding in the car together; that they had started to jail between the two police cars when they attempted to escape. In the chase the shooting occurred. This is sufficient evidence from which a jury could find each of them guilty of the charge.

Counsel states that Hughes could not be connected with assault on Grantham as the evidence does not support the charge. It is claimed that she could not be convicted as a principal under § 13-139 because it was not shown that she actually committed the crime; that it was necessary that she perform some positive act and cites State v. Bearden, 99 Ariz. 1, 405 P.2d 885. However, we cannot agree that State v. Bearden supports defendant's contention. On the contrary it supports the principles we have here stated, holding that reversible error occurs only where there is a complete absence of probative facts supporting a verdict.

In the instant case there is substantial evidence from which the jury could have found that the acts of each of the defendants were intentionally committed for the purpose of their escape. The testimony of officer Jones supported the charge that defendant Hughes shot at him and there was substantial evidence that Andrews shot at officer Grantham. The evidence was sufficient to support the finding of the jury that each was a principal on both counts. It is immaterial whether one or both of the defendants committed each of the acts charged. § 13-139 A.R.S.; State v. Bear-

den, supra; Cline v. State, 21 Ariz. 554, 192 P. 1071.

■ Counsel for the defendants contends that conflicts in the evidence supports his contention that the verdicts should be reversed. As we stated in State v. Crawford, supra, it is not the function of this court to retry conflicts in evidence. This is a question for the jury. State v. Owen, 101 Ariz. 156, 416 P.2d 589, cert. den. 388 U.S. 915, 87 S.Ct. 2128, 18 L.Ed.2d 1356; State v Bearden, supra.

Counsel for the defendants contends under questions 1 and 4 that the defendants were forced to use the same court appointed attorney and that there was a conflict of interest and for this reason defendants were "denied equal protection of the law."

■ In order for assistance by counsel for an accused to be impaired by representation of the same attorney, actual conflict must in fact have existed or be inherent in the facts of the case from which a possibility of prejudice flows. State v. Collins, 104 Ariz. 449, 454 P.2d 991; State v. Kruchten, 101 Ariz. 186, 417 P.2d 510, cert. den. 385 U.S. 1043, 87 S.Ct. 784, 17 L.Ed. 2d 687.

■ In the instant case no actual conflict of interest is shown nor are there any facts which show a possibility of a conflict of interest. The defense of both defendants was the same. They did not remember the facts. The testimony of neither in any way conflicted with that of the other.

■ Defendant Andrews contends that his conviction amounted to double jeopardy in that he committed only one act which consisted of firing a series of shots at officer Grantham. He made a motion before the trial to quash the information upon the grounds that it constituted double jeopardy in that he had previously pleaded guilty to a violation of A.R.S. §§ 13–917 and 13–917.01 which makes it a misdemeanor to recklessly or carelessly handle a firearm, or discharge a firearm in such a manner

as to endanger life or property. Both defendants were charged with the crime of assault with a deadly weapon. The essential element is an unlawful attempt coupled with present ability to commit violent injury upon another with a deadly weapon. The essential elements of §§ 13–917 and 13–917.01 is to recklessly or carelessly handle a firearm or discharging a firearm in such a manner as to endanger life or property or the mere act of firing a gun within the city limits. This does not require an intent to do bodily harm.

According to the testimony there were 20 or 25 shots fired that morning which constituted assault with a deadly weapon. There were only a few made at Grantham and a few at Jones. There is nothing in the record to show that they were the same ones for which a plea of guilty was made under § 13–917.01, subsec. A. The shots which were directed at the police in this case constitute the two counts of the charges of assault with a deadly weapon against the police officers. The wild or reckless shots do not constitute a part of the act of assault with a deadly weapon against the officers.

■ Defendant Andrews also contends that the evidence shows a single act within the meaning of State v. Ballez, 102 Ariz. 174, 427 P.2d 125. With this we cannot agree. Ballez was a case in which the defendant was charged with robbery and grand theft. We stated that the statute contemplated a situation in which a single act violated more than one statute and protected the offender against double punishment in such instances. But here it was not a single act. There was a series of acts so that Ballez is not applicable. The argument of the defendant under his question of double punishment falls short for the same reason. He relies on A.R.S. § 13–1641 which provides:

"An act or omission which is made punishable in different ways by different sections of the laws may be punished under either, but in no event under more than one. An acquittal or conviction

and sentence under either one bars a prosecution for the same act or omission under any other."

As we held in State v. Westbrook, 79 Ariz. 116, 285 P.2d 161, in interpreting § 43–6101, Ariz. Code Ann. (1939), which was identical to A.R.S. § 13–1641.

"The circumstances that almost identical evidence was used in the prosecution of the two crimes involved in this appeal is not fatal. The act or omission to be proved in each case was patently different."

■ The second question involved in State v. Westbrook, supra, is the same as raised by counsel in the instant case in regard to double jeopardy. In this connection we said:

"The problem is whether the conspiracy to commit burglary is an 'offense necessarily included' within the crime of attempted burglary. The test to be applied is simple: Is the first offense one that cannot be committed without necessarily committing the second?" (cases cited)

Counsel for the defendants makes the same argument in his contention that the court should have instructed as to a lesser offense as to both defendants on the grounds that neither could have committed the first without necessarily committing the second. We cannot agree with the argument on double punishment or his argument for an instruction on a lesser offense. In the commission of assault with a deadly weapon, when it is with a gun, it does not require the firing of the gun. The pointing of a loaded gun in a threatening manner within striking distance of another party has been held to support a conviction of assault with a deadly weapon, State v. Seymour, 101 Ariz. 498, 421 P.2d 517; Territory v. Gomez, 14 Ariz. 139, 125 P. 702.

■ The defendant also contends that the flight instruction should not have been given. The evidence justified such an in-

struction. The defendants both fled from the car after the commission of the act. State v. Loftis, 89 Ariz. 403, 363 P.2d 585; State v. Guerrero, 58 Ariz. 421, 120 P.2d 798.

■ As to the next contention that the sentences of each of the defendants was excessive, we have frequently held that the trial court has wide discretion in passing sentence and that we will uphold the sentence if it is within the statutory limits unless there is clear abuse of discretion. The sentences in the instant case are within the statutory limits and we find no abuse of the court's discretion. State v. Davis, 105 Ariz. 498, 467 P.2d 743.

■ Counsel for defendants also filed a supplemental brief in which he pointed out that since the filing of his other briefs we had handed down the decision in State v. Shaw, 106 Ariz. 103, 471 P.2d 715, holding that A.R.S. § 13–1621.01 as it related to bifurcated trials violated due process of law. Counsel states that our holding in State v. Shaw, supra, requires the judgment and sentence in the instant case be set aside and a new trial ordered.

We would call attention to the fact that in the instant case the defendants were permitted to introduce evidence as to their mental capacity, both testifying they were "loaded" with drugs, using this as evidence to negative their ability to form an intent to commit the crime for which they were charged. They were not deprived of due process in the presentation of this evidence. However, all of the questions presented in their briefs were passed upon and settled in State ex rel. Berger v. Superior Court, 106 Ariz. 365, 476 P.2d 666, in which we held State v. Shaw, supra, was not retroactive.

Judgment affirmed.

LOCKWOOD, C. J., STRUCKMEYER, V. C. J., and UDALL and HAYS, JJ., concur.